USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/22/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
RONALD A. DOWNES,

        Plaintiff,

   -v.-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.
------------------------------------------------------------X

**OPINION AND ORDER**

No. 14-CV-7147 (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

*Pro se* Plaintiff Ronald A. Downes seeks judicial review of a final determination by the Commissioner of Social Security ("Commissioner"), denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") for the period between February 10, 2010 and November 14, 2011. The Commissioner has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons set forth below, the Commissioner's motion is denied, and the case is remanded for further proceedings.

## I.    BACKGROUND

### A.   Procedural History

Downes applied for DIB on July 7, 2011 and for SSI on July 15, 2011. Administrative Record ("R.") at 41, 98, 136-45, 146.[1] Downes claimed disability beginning on February 10, 2010 due to a collapsed lung, hypertension, and depression.[2] *Id.* at 150. On September 19, 2011,

---

[1]     The administrative record consists of one docket entry with 22 attached supplemental documents. (Dkt. Nos. 13-1 to 13-22). For clarity and consistency, citations to the record will refer to the pagination that runs sequentially throughout the various entries and is marked in bold in the lower right-hand corner.

[2]     A pneumothorax is the medical term for a collapsed lung. *See* http://www.mayoclinic .org/diseases-conditions/pneumothorax/basics/definition/con-20030025 (last visited on July 20,

the Social Security Administration ("SSA") denied both of his applications. *Id.* at 42-47. On

October 28, 2011, Downes filed a request for a hearing before an Administrative Law Judge

("ALJ"). *Id.* at 48-52. Represented by counsel, Downes appeared at a hearing held before ALJ

Zachary Weiss on December 19, 2012. *Id.* at 29-40. In a written decision dated January 17,

2013, the ALJ concluded that Downes was disabled beginning on November 15, 2011 due to a

stroke, but found that he was not disabled prior to that date. *Id.* at 17-23. Downes sought review

of the ALJ's decision on March 5, 2013, and the SSA Appeals Council denied review on July 2,

2014, rendering the ALJ's determination the Commissioner's final decision. *Id.* at 1-3, 11-12.

Downes timely commenced the current action on August 28, 2014, seeking judicial

review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). *See*

Complaint ("Compl.") (Dkt. No. 2). On February 23, 2015, the Commissioner filed her Answer

(Dkt. No. 14) and moved for judgment on the pleadings pursuant to Rule 12(c). *See* Notice of

Motion for Judgment on the Pleadings (Dkt. No. 15); Memorandum of Law in Support of

Judgment on the Pleadings (Dkt. No. 16). Downes submitted no opposition to the motion. By

letter dated May 28, 2015, however, Downes asked the Court to consider additional evidence in

deciding the Commissioner's motion and enclosed a compact disc containing images of recent

lung x-rays. (Dkt. No. 21). The Commissioner responded by letter dated June 17, 2015, arguing

that Downes' submission did not support his claim of disability beginning in February 2010, and

urged the Court to affirm the Commissioner's decision. (Dkt. No. 22).

---

2015). It occurs when air leaks into the space between the lungs and chest wall. *Id.* This air
pushes on the outside of the lung and makes it collapse. *Id.* In most cases, only a portion of
the lung collapses. *Id.* In the record, pneumothorax is used interchangeably with a collapsed
lung.

**B.     The Administrative Record**

### 1. Downes' Background

Downes, a Bronx resident, was 55 years old on the onset date of his alleged disability. R. at 146. Since April 1990, Downes had performed various jobs, working as an account executive, a sales representative, a project coordinator, a product demonstrator, a customer care representative, and a property inspector. *Id.* at 169-76. Prior to (and shortly after) his alleged disability onset date, he worked as a customer care representative for a pharmaceutical company from October 2009 to March 2010. *Id.* at 169, 171. Downes worked eight hours a day, five days a week. *Id.* at 171. He stopped working in March 2010 because he was laid off. *Id.* at 150, 196. From October 2010 to February 2011, Downes worked full-time as a property inspector. *Id.* at 169-70. During this period, he worked eight hours a day, five days a week, and earned four dollars per work order. *Id.* at 170. The record does not specify his total income. *Id.*

Downes' disability claims are based on a collapsed lung, hypertension, and depression. *Id.* at 150. With respect to symptoms related to his collapsed lung, Downes stated in a "Function Report" submitted to the SSA that he experienced shortness of breath when climbing stairs or walking on an incline. *Id.* at 165. On level ground, he needed to pace himself to walk one or two miles. *Id.* at 166. Downes could not lift in rapid succession and experienced uncomfortable pain in his abdomen when it rained or snowed due to lower atmospheric pressure. *Id.* at 160, 164. He reported that his depression caused him to stop engaging in activities he had enjoyed in the past, but most of the time he did not feel overwhelmed by stress. *Id.* at 164, 167.

In his submissions to the SSA, Downes described his daily activities. *Id.* at 160-64. He said that he cooked his own breakfast and handled chores such as laundry or cleaning his house. *Id.* at 160-62. He also performed volunteer work at a building, sweeping, mopping, pulling garbage, and separating recyclables. *Id.* at 160. Downes stated, however, that he was unable to

3

engage in physical activities such as working out, riding a bicycle, or performing work that required walking. *Id.*

## 2. Medical Evidence

### a. Treating Physicians

#### i. Dr. Harvey S. Weingarten's Treatment Notes

The record contains treatment notes from Dr. Harvey S. Weingarten, who saw Downes for regular checkups to monitor his hypertension since at least March 2009. *Id.* at 197. On February 11, 2010, Downes saw Dr. Weingarten after experiencing shortness of breath and chest pain the previous night. *Id.* Dr. Weingarten observed faint pulse, decreased air entry in Downes' left lung, and significant changes in his electrocardiogram impression from one performed in 2009. *Id.* Dr. Weingarten referred Downes to the emergency room, and he was hospitalized at Robert Wood Johnson Hospital from February 11 to February 18, 2010. *Id.* at 154, 197. The SSA made two attempts to obtain records from Downes' hospitalization at Robert Wood Johnson Hospital, but was unable to secure them. *Id.* at 261. According to subsequent treatment notes, Downes was diagnosed with a spontaneous pneumothorax at Robert Wood Johnson Hospital and underwent a VATS pleurodesis.[3] *Id.* at 196.

#### ii. Dr. T. M. Piparo's Treatment Notes

On February 24, 2010, Downes was seen by Dr. T. M. Piparo. *Id.* at 196. Dr. Piparo's treatment notes indicated that Downes had only minimal left-sided chest discomfort and numbness. *Id.* He also stopped taking the Percocet that had been prescribed at the hospital. *Id.*

---

[3]     VATS is the acronym for video-assisted thoracic surgery. Davis, Medical Abbreviations, 339 (9th ed. 2001). Pleurodesis is a procedure that causes the membranes around the lungs to stick together and prevents the buildup of fluid in the space between the membranes (pleural space). *See* http://www.medicinenet.com/script/main/art.asp?articlekey=20053 (last visited on July 20, 2015).

4

Dr. Piparo observed that his lungs were clear to auscultation.[4] *Id.*

On March 24, 2010, Downes saw Dr. Piparo for a follow-up on his blood pressure and to obtain referrals for chest x-rays and a pulmonology evaluation. *Id.* Upon physical examination, Dr. Piparo observed Downes' lungs to be clear and his heart rate and rhythm to be regular. *Id.* Downes denied any chest pain or headaches. *Id.* He missed his next scheduled appointment with Dr. Piparo on June 29, 2010. *Id.*

Downes saw Dr. Piparo again on July 29, 2010. *Id.* He denied experiencing chest pain, shortness of breath on exertion, headache, or dizziness. *Id.* However, Dr. Piparo noted that Downes' hypertension was poorly controlled and he was not compliant with his medication, diet, and exercise regimen. *Id.* Downes was prescribed new medications for hypertension. *Id.* at 195. He missed his next scheduled appointment on August 30, 2010. *Id.*

When Downes next visited Dr. Piparo on September 10, 2010, Downes denied experiencing headaches, weakness, chest pain, dyspnea (shortness of breath) on exertion, edema (swelling), or polydipsia or polyphagia (excessive thirst or hunger). *Id.* His chest was clear without any wheezing, rales, or rhonchi, and his heart sounds were normal. *Id.* There was no edema of his extremities, and his abdomen was soft and not tender or distended. *Id.* Downes was to continue on his hypertension medications. *Id.*

Almost a year later, on August 16, 2011, physician assistant Meredith Saulnier made a note that Downes had come in to have disability forms completed. *Id.* at 194. She noted that Downes had not been in the office for the past 11 months. *Id.* Downes attributed his disability

---

[4]     Auscultation is the method of listening to the sounds of the body during a physical examination. *See* http://www.nlm.nih.gov/medlineplus/ency/article/002226.htm (last visited on July 20, 2015). It is usually done using a stethoscope. *Id.* Health care providers routinely listen to a patient's lungs, heart, and intestines to evaluate the frequency, intensity, duration, number, and quality of sounds. *Id.*

5

to a collapsed lung in February 2010 and reported difficulty walking upstairs and shortness of breath with exertion or in humid weather. *Id.* He had run out of his hypertension medication one month earlier. *Id.* Downes also indicated that he had not recently had a pulmonary or cardiac evaluation due to insurance issues. *Id.* Upon physical examination, Saulnier noted hypertension and dyspnea upon exertion. *Id.* Nevertheless, she found that Downes' lungs were clear, his extremities were without edema, and his mood was appropriate. *Id.* She prescribed medication for hypertension. *Id.*

## b.   Consultative Examinations

### i.   Physical Examination by Dr. Vinod Thukral

On August 18, 2011, Dr. Vinod Thukral conducted a consultative internal medicine examination of Downes. *Id.* at 190-93. Downes reported that since experiencing a left pneumothorax in February 2010, he had intermittent shortness of breath after activities such as running, bicycling, and walking up hills. *Id.* at 190. However, he denied any cough, phlegm, fever, hemoptysis (coughing up blood), or any other symptoms related to pneumothorax. *Id.* Downes also reported that he suffered from depression since 2007, for which he took medication until 2008. *Id.* at 190. Since then, Downes said he was feeling fine and had not been on antidepressants for the last three years. *Id.* He also stated at the examination that he had a history of hypertension since 2007 and was currently on Metoprolol, but denied any complications from the condition. *Id.* at 191. Regarding his daily activities, Downes reported that he cooked and cleaned on a daily basis, did laundry once a week, and shopped once a month. *Id.* He also said that he watched TV, listened to the radio, read, and went out for walks in the park. *Id.*

Upon examination, Dr. Thukral found that Downes' lungs were clear to auscultation, his percussion and diaphragmatic motion were normal, and there were no abnormalities in his chest

6

walls. *Id.* at 192. His blood pressure was 150/80, and he was asymptomatic with respect to hypertension. *Id.* at 191. His heart rhythm was regular. *Id.* at 192. Downes did not appear to be in acute distress, his gait and stance were normal, and he could fully squat. *Id.* His hand and finger dexterity was intact. *Id.* at 193. Upon mental status screening, Downes' affect was normal and he denied any suicidal ideation. *Id.* He was dressed appropriately, appeared oriented, maintained good eye contact, and there was no evidence of impaired judgment or memory. *Id.*

Dr. Thukral diagnosed Downes with "hypertension by history, depression by history, left pneumothorax by history, intermittent shortness of breath by history, and drug use by history." *Id.* at 193. He gave Downes a "fair" prognosis, and opined that he had no limitations to sitting, standing, pushing, pulling, or other similar activities. *Id.*

### ii.    Psychiatric Evaluations by Dr. Herb Meadow and Psychologist T. Harding

On the same day, Dr. Herb Meadow conducted a consultative psychiatric evaluation. *Id.* at 204-07. Dr. Meadow noted that Downes did not have a history of psychiatric hospitalizations or treatment. *Id.* at 204. Downes denied being currently depressed, but reported depression in the past. *Id.* He said that he had occasional anxiety, but denied panic attacks, manic symptoms, thought disorder, or cognitive deficits. *Id.*

Upon a mental status evaluation, Dr. Meadow did not find abnormalities regarding Downes' appearance, speech, or motor behavior. *Id.* at 205. His thought processes were coherent and goal-directed. *Id.* There was no evidence of hallucinations, delusions, or paranoia. *Id.* His affect was appropriate to speech, his mood was neutral, and his sensory faculties were clear. *Id.* Dr. Meadow found that Downes' cognitive functioning was average and his judgment and insight were fair. *Id.* Downes stated in the evaluation that he was able to take care of his

7

personal hygiene and perform household chores. *Id.* He also socialized with friends and family, and enjoyed watching TV, listening to music, reading, and photography. *Id* at 205-06. Dr. Meadow gave Downes a "fair" prognosis, and concluded that he was able to perform all tasks necessary for vocational functioning. *Id.* at 206.

Subsequently, psychologist T. Harding of the Division of Disability Services ("DDS") submitted a psychiatric review technique, opining that Downes' mental impairment was not severe and imposed no limitations on his activities of daily living or his ability to maintain social functioning, concentration, persistence, or pace. *Id.* at 208, 218. Harding noted that there was insufficient evidence to conclude whether Downes had suffered any episodes of deterioration of extended duration. *Id.* at 218.

### c.   Treatment for Right-Sided Pneumothorax

From August 23 to August 27, 2011, Downes was treated at Montefiore Medical Center ("Montefiore") for a right-sided spontaneous pneumothorax. *Id.* at 232-60, 1640-50, 1744. He underwent surgical placement of a chest tube and was discharged in stable condition. *Id.* at 232, 1744. On September 20, 2011, Downes underwent elective VATS with bleb resection.[5] *Id.* at 351, 1744.

### d.   Treatment for Stroke

On October 25, 2011, Downes was admitted to the stroke service at Montefiore for complaints of right-sided facial, arm, and leg weakness, and some difficulty speaking. *Id.* at 1531-63. He was diagnosed with an acute left basal ganglia/corona radiate infarct, and

---

[5]      Apical bleb resection is the treatment for spontaneous pneumothorax. *See* http://www .cvtsc.com/surgery/lung-surgery.html (last visited on July 20, 2015). The thoracoscopic camera is used to determine the location of the bleb (bubble) on the lung surface, usually at the top of the lung. *Id.* Specially designed staples are used to close the leak and remove a small portion of the lung apex. *Id.* A chest tube is left in place. *Id.* The procedure is 99% effective in curing spontaneous pneumothorax. *Id.* The hospital stay is typically two or three days. *Id.*

8

hypertension.[6] *Id*. at 1531. Downes' symptoms completely resolved, and he was discharged on October 27, 2011. *Id*. at 1136, 1570. However, Downes was readmitted to the stroke service three days later, on October 30, 2011, with similar right-sided weakness, and was noted to have an extension of the infarct along the left caudate nucleus. *Id*. at 1239-40, 1245. While receiving rehabilitation services, he developed palpitations and was found to have a new onset of atrial fibrillation. *Id*. at 816, 1122-23.

On November 15, 2011, Downes was transferred to the Montefiore Lubin Rehabilitation Center for physical and occupational therapy for an inability to walk related to right-sided hemiparesis (weakness on one side of the body) resulting from the left-sided cerebrovascular accident ("CVA" or stroke). *Id*. at 267, 343-58. Upon admission, Downes reported that he had been independent in ambulation and activities of daily living, and had traveled to Barbados in July 2011. *Id*. at 351. In his social evaluation form, Downes stated that prior to the CVA, he was working and independent. *Id*. at 436. Downes was discharged from the rehabilitation center on November 30, 2011. *Id*. at 344, 438. He was given a prescription for outpatient physical therapy, and a walker was ordered for him. *Id*. at 314, 438. Downes continued with outpatient physical therapy at Montefiore for the right sided hemiparesis until May 2012. *Id*. at 1750-81, 1783-96.

---

[6]     The basal ganglia is a region of the base of the brain that consists of three clusters of neurons (caudate nucleus, putamen, and globus pallidus) that are responsible for involuntary movements such as tremors, athetosis, and chorea. *See* http://www.medicinenet.com/script/main/art.asp?articlekey=10030 (last visited on July 20, 2015). Corona radiata is a large mass of myelinated nerve fibers radiating from the internal capsule to the cerebral cortex. *See* http://www.merriam-webster.com/dictionary/corona%20radiata (last visited on July 20, 2015). An infarct is an area of tissue death that is due to a local lack of oxygen. *See* http://www.medicinenet.com/script/main/art.asp?articlekey=3969.

9

### 3. Hearing Before the ALJ

ALJ Weiss held a hearing on December 19, 2012 to assess Downes' eligibility for DIB and SSI. *Id.* at 31-40. At the hearing, Downes was represented by counsel, but did not testify. *Id.* Medical expert Dr. Harold Bernanke and vocational expert Andrew Vaughn were also present at the hearing to testify. *Id.* Dr. Bernanke provided an opinion as to Downes' medical conditions and physical limitations; however, the ALJ took no testimony from Vaughn. *Id.* at 33-40.

At the hearing, counsel argued that Downes' two strokes left him with limitations, but did not discuss Downes' two episodes of pneumothorax. *Id.* at 32-33. The ALJ also focused on whether Downes was disabled after his two strokes, and did not question counsel or Dr. Bernanke regarding Downes' episodes of pneumothorax. *Id.* at 32-40. To determine Downes' disability after the two strokes, the ALJ asked Dr. Bernanke whether Downes was capable of medium work, and Dr. Bernanke confirmed that he was not. *Id.* at 33-35, 38. He stated that the strokes left Downes with right-side paralysis causing difficulty with the right shoulder and with the right upper extremities, including the thumb and a couple of fingers. *Id.* at 36. However, Dr. Bernanke also said that he was unable to determine Downes' ambulatory capability based on the record and that Downes had "other problems," including a history of two episodes of pneumothorax. *Id.* Dr. Bernanke testified that Downes' exercise capacity significantly diminished after the pneumothorax, *id.* at 37, and that he had shortness of breath with minimal exertion, which was "a limiting factor in his capability to function." *Id.* at 38. Dr. Bernanke noted, however, that his assessment was based on the tests taken at Montefiore, which he could not clearly evaluate. *Id.* As a result, he reiterated that he was unable to determine Downes' ability to ambulate. *Id.*

10

## II.    DISCUSSION

A.    **Legal Standards**

### 1.  Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted). In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is "particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings would . . . plainly help to assure the proper disposition of [a] claim.'" *Kirkland v. Astrue*, No. 06-CV-4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts*, 388 F.3d at 386).

The substantial evidence standard is a "very deferential standard of review," *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012), and the reviewing court "must be careful not

11

to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). In other words, "once an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

### 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the individual] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In general, when assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of HEW*, 463 F.2d 38, 41 (2d Cir. 1972)); *see Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur*, 722 F.2d at 1037 (citations

12

omitted).

### a. Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.1 (2d Cir. 2013) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). First, the Commissioner must establish whether the claimant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in substantial gainful activity, then the Commissioner finds that he is not disabled, "regardless of [his] medical condition or [his] age, education, and work experience." 20 C.F.R. § 404.1520(b); 20 C.F.R. § 416.920(b). If the claimant is not employed, at the second step the Commissioner determines whether the claimant has a "severe impairment" restricting his ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has a severe impairment, the Commissioner moves on to the third step, considering whether the claimant has an impairment that is listed in Appendix 1 to 20 C.F.R. Pt. 404, Subpt. P (a "Listing"). 20 C.F.R. § 404.1520(a)(4)(iii). If so, the Commissioner will find the claimant disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues on to the fourth step, determining whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step, ascertaining whether the claimant possesses the ability to perform any other work, 20 C.F.R. § 404.1520(a)(4)(v), typically by relying on the applicable medical vocational guidelines, known as the "Grids." *See Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (citing *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)).

The claimant bears the burden of proving disability in steps one through four of the sequential analysis. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner on the fifth and final step, where she must

establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Substantial Gainful Activity

Substantial gainful activity involves any work, whether full or part-time, that is both substantial, in that it "involves doing significant physical or mental activities," and gainful, *i.e.*, "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972. The SSA "generally consider[s] work that [the claimant is] forced to stop or to reduce below the substantial gainful activity level after a short time because of [his] impairment to be an unsuccessful work attempt." 20 C.F.R. § 416.974(a)(1). For employment to be considered an unsuccessful work attempt, it must be for a period of six months or less, there must have been a significant break before the work attempt, and the termination of employment must be due to the claimant's impairment. 20 C.F.R. § 416.974(c).

Generally, in evaluating whether work constitutes substantial gainful activity, the SSA's primary consideration is the earnings derived from the work activity. 20 C.F.R. § 416.974(a)(1). If a claimant's earnings exceed the threshold amounts specified in the Commissioner's regulations, there is a rebuttable presumption that the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.974(b)(2)(ii); *accord Surgeon v. Comm'r of Soc. Sec.*, 190 F. App'x 37, 39 (2d Cir. 2006). However, earnings from an unsuccessful work attempt will not demonstrate that the claimant is able to do substantial gainful activity. 20 C.F.R. § 416.974(a)(1); *Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-6704 (JPO), 2015 WL 321832, at *31 (S.D.N.Y. Jan. 23, 2015) (citing SSR 05-02, 2005 WL 568616, at *1-3, (S.S.A. Feb. 28, 2005)).

Although the claimant "bears the burden of establishing that despite surpassing the established level of earnings, [the claimant] was not engaged in substantial gainful activity,"

14

*Byrd v. Astrue*, No. 12-CV-2211 (JS), 2013 WL 4459040, at *10 (E.D.N.Y. Aug. 16, 2013)

(citation omitted), the Commissioner will not solely rely on information provided by the

claimant. SSR 05-02, at *3. "If [the Commissioner] does not already have impartial supporting

evidence, [it] will seek confirmation from the claimant's employers," and if such information is

inconclusive or unavailable, the Commissioner "may seek confirmation of the reason [the

claimant] discontinued or reduced [his] work with a physician or other medical source." *Id.*

### c.   Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530

U.S. 103, 110-11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must

on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-

adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)

(internal quotation marks and citation omitted). As part of this duty, the ALJ must "investigate

the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at

111. Specifically, under the applicable regulations, the ALJ is required to "develop a complete

medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d

Cir. 1996) (citing 20 C.F.R. § 404.1512(d)-(f)). This responsibility "encompasses not only the

duty to obtain a claimant's medical records and reports but also the duty to question the claimant

adequately about any subjective complaints and the impact of the claimant's impairments on the

claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317,

at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has met his duty to develop the record is a threshold question. Before

determining whether the Commissioner's final decision is supported by substantial evidence

under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a

full hearing under the Secretary's regulations' and also fully and completely developed the

15

administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM), 2010 WL 2736879, at *12

(E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751,

755 (2d Cir. 1982)); *Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3

(E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock

principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)). This

imperative remains in force even where the claimant is represented by counsel. *Perez*, 77 F.3d at

47.

It is well-settled that the ALJ has an affirmative duty to develop the record in a disability

benefits proceeding and that remand is appropriate where this duty is not discharged. *See, e.g.*,

*Moran*, 569 F.3d at 114-15 ("We vacate not because the ALJ's decision was not supported by

substantial evidence but because the ALJ should have developed a more comprehensive record

before making his decision."); *Rosa*, 168 F.3d at 83 (remand appropriate where ALJ, *inter alia*,

failed to obtain adequate information from treating physician and to seek potentially relevant

information from other doctors and treatment facilities).

### d. Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining

whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No.

11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (internal quotation

marks omitted) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)). However, a treating physician's

opinion is given controlling weight—that is, it is binding—provided the opinion as to the nature

and severity of an impairment "is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

record." 20 C.F.R. § 404.1527(c)(2); *see also Selian*, 708 F.3d at 418 ("The opinion of a treating

physician on the nature or severity of a claimant's impairments is binding if it is supported by

16

medical evidence and not contradicted by substantial evidence in the record.") (citing *Burgess*, 537 F.3d at 128 and *Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003)). The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

Under certain circumstances, however, a treating physician's opinion will not be controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling" because such opinions are reserved for the Commissioner. *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(l), 416.927(e)(l)); *accord Rosier v. Colvin*, 586 F. App'x 756, 758 (2d Cir. 2014) ("[T]reating physician's statement that the claimant is disabled cannot itself be determinative.") (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given."). Importantly, however, "[t]o the

extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear

gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708

F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d

Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician *sua*

*sponte* if clinical findings are inadequate). As a result, "the 'treating physician rule' is

inextricably linked to the duty to develop the record. Proper application of the rule ensures that

the claimant's record is comprehensive, including all relevant treating physician diagnoses and

opinions, and requires the ALJ to explain clearly how these opinions relate to the final

determination." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13

(S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust.") *adopted*,

2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

Because "[t]he expert opinions of a treating physician as to the existence of a disability

are binding on the fact finder, it is not sufficient for the ALJ simply to secure raw data from the

treating physician." *Jackson v. Colvin*, No. 13-CV-5655 (AJN) (SN), 2014 WL 4695080, at *19

(S.D.N.Y. Sept. 3, 2014) (quoting *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)).

Therefore, "the ALJ must 'make every reasonable effort to obtain not merely the medical records

of the treating physician but also a report that sets forth the opinion of that treating physician as

to the existence, the nature, and the severity of the claimed disability.'" *Molina v. Barnhart*, No.

04-CV-3201 (GEL), 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005) (quoting *Peed*, 778 F.

Supp. at 1246). Although the relevant regulations provide that "the lack of the medical source

statement will not make [a medical] report incomplete," 20 C.F.R. § 416.913(b)(6), "the Second

Circuit requires the ALJ 'to seek additional information from [the treating physician] *sua*

*sponte*.'" *Molina*, 2005 WL 2035959, at *6 (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d

18

116, 118 (2d. Cir. 1998)). "This duty exists even when the claimant is represented by counsel."
*Clark*, 143 F.3d at 118 (quoting *Perez*, 77 F.3d at 47).

Accordingly, unless "there are no obvious gaps in the administrative record and the ALJ
already possesses a 'complete medical history,'" *Rosa*, 168 F.3d at 79 n.5, remand is necessary
where the ALJ did not attempt to obtain opinions from the claimant's treating physicians to
accompany primary source records. *See Umansky v. Apfel*, 7 F. App'x 124, 127 (2d Cir. 2001)
(remanding case for ALJ's failure to obtain medical source opinions to corroborate a rejected
opinion); *Intonato v. Colvin*, No. 13-CV-3426 (JLC), 2014 WL 3893288, at *13 (S.D.N.Y. Aug.
7, 2014) (remanding case, in part, for ALJ's failure to obtain treating physician's medical
opinion in addition to primary source records); *Miller v. Barnhart*, No. 03-CV-2072 (MBM),
2004 WL 2434972, at *8 (S.D.N.Y. Nov. 1, 2004) ("The ALJ's failure to solicit specific
opinions from plaintiff's treating physician on 'the existence, the nature, and the severity of the
claimed disability' was . . . error.") (citation omitted).

**B.    The ALJ's Decision**

### 1.  Downes' Disability Prior to November 15, 2011

In a decision dated January 17, 2013, the ALJ determined that Downes was not disabled
prior to November 15, 2011, as defined by the Social Security Act and applicable regulations,
and denied Downes' claims for DIB and SSI for the period between February 10, 2010 and
November 14, 2011. R. at 17-23. Following the five-step inquiry, the ALJ first determined that
Downes had not engaged in substantial gainful activity since February 10, 2010, the alleged
onset date of his disability. *Id.* at 19. The ALJ came to this conclusion without analyzing
whether Downes' job as a property inspector between October 2010 and February 2011
constituted substantial gainful activity. At step two, the ALJ found Downes' impairment due to
left-sided pneumothorax to be severe and the impact of such impairment to impose significant

vocationally relevant limitations.[7] *Id.* at 19-20. Regarding Downes' depression, the ALJ noted that Downes was not in treatment for any psychological disorder, and he accepted the conclusions of Dr. Meadow and psychologist T. Harding that Downes' depression was not severe enough to impose significant limitations on his daily activities. *Id.* at 20. At step three, the ALJ determined that Downes did not have an impairment or combination of impairments that met or was medically equal to the severity of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "Listing"). *Id.* He also noted that Downes rapidly recovered from his collapsed lung. *Id.*

The ALJ then moved on to step four, and found that Downes had the residual functional capacity for the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). *Id.* at 20-21. In reaching this conclusion, the ALJ discredited Downes' statements concerning the intensity, persistence, and limiting effects of his symptoms prior to November 15, 2011; he found the statements inconsistent with a questionnaire that Downes had filled out dated August 11, 2011, which indicated that he could still lift some weight and could walk one to two miles on level ground despite occasional shortness of breath. *Id.* at 21. The ALJ also accepted the medical opinion of consultative internist Dr. Thukral that Downes had not experienced any significant physical limitations during the period between February 10, 2010 and November 14, 2011. *Id.* Finally, the ALJ found that Downes' prior job as a property inspector did not require any more than sedentary exertion, and concluded that the impact of Downes' physical impairment did not prevent him from resuming his past work. *Id.* at 22. Therefore, at step four, the ALJ determined that Downes was not disabled, and did not proceed to step five. *Id.*

---

[7]     The ALJ did not specifically mention Downes' hypertension or right-sided pneumothorax.

**2. Downes' Disability After November 15, 2011**

The ALJ found that Downes had become disabled starting November 15, 2011 due to the residual effects of his stroke. *Id.* at 22-23. The ALJ noted based on the medical record that, following his stroke, Downes could not lift or carry more than two pounds and was unable to sit for more than four hours or stand or walk for more than two hours during an eight hour workday. *Id.* at 22. Therefore, he concluded that Downes was unable to perform work that required the full range of sedentary exertion, and found that he was precluded from performing his past relevant work as a property inspector, a product demonstrator, a project coordinator, or a retail sales representative. *Id.* Finally, the ALJ referred to the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2, and based on Downes' RFC, age, education, and work experience, he concluded that Downes was disabled under the Medical-Vocational Rule 201.06. *Id.* at 22-23.

**C.   Analysis**

As Downes is proceeding *pro se*, the Court liberally construes his complaint to raise the strongest arguments it suggests, specifically that the ALJ did not comply with the applicable legal standards and/or made a determination that was not supported by substantial evidence regarding his alleged disability during the period between February 10, 2010 and November 14, 2011. *See, e.g.*, *Wellington v. Astrue*, No. 12-CV-3523 (KBF), 2013 WL 1944472, at *3 (S.D.N.Y. May 9, 2013). Here, the Court construes Downes' form complaint specifically to allege that, as a threshold matter, the ALJ failed to develop a complete and full evidentiary record pertaining to Downes' alleged disability prior to November 15, 2011. *See* Compl. ¶ 9. Upon review of the record, the Court finds that the ALJ did not satisfy this threshold requirement because: (a) he did not resolve the ambiguity in Downes' work history as to whether he was engaged in substantial gainful activity during his alleged period of disability; and (b) he did not

21

attempt to obtain the opinions of Downes' two treating physicians, Drs. Weingarten and Piparo, as to the limitations that Downes' pneumothorax imposed on his work-related capabilities.

## 1. The ALJ Did Not Fully Develop the Administrative Record

"Whether the ALJ failed to develop the record adequately must be addressed as a threshold issue." *Jackson*, 2014 WL 4695080, at *18; *see Echevarria*, 685 F.2d at 755 ("[I]n deciding whether the Secretary's conclusions . . . are supported by substantial evidence, which is the test on review, . . . we must first satisfy ourselves that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.'") (citations omitted); *Paterson v. Colvin*, No. 12-CV-3020 (LTS) (JLC), 2014 WL 4419688, at *8 (S.D.N.Y. Sept. 9, 2014) *adopted,* 2014 WL 4977493 (S.D.N.Y. Oct. 3, 2014). Even if the ALJ's decision might ultimately be supported by substantial evidence, the Court cannot reach this conclusion where the decision was based on an incomplete record. *Id.*

### a. The ALJ Failed to Develop the Record as to Downes' Ambiguous Work History

The ALJ's duty to develop the record includes resolving known ambiguities that may bear on the ALJ's disability determination. *See Camilo v. Comm'r of the Soc. Sec.*, No. 11-CV-1345 (DAB) (MHD), 2013 WL 5692435, at *22 (S.D.N.Y. Oct. 2, 2013); *cf.* 42 U.S.C. § 405(d) (explaining that the duty to develop the record applies to "any matter under investigation"). This includes resolving significant ambiguities relating to a claimant's work history. *See, e.g., Rivera v. Barnhart*, 379 F. Supp. 2d 599, 605 (S.D.N.Y. 2005) (remanding for failure to develop record with regard to claimant's work history).

In order for Downes to be pronounced disabled, his injury should render him unable to engage in any substantial gainful activity for "a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Downes, however, worked for approximately five months as a

22

property inspector during his alleged period of disability, specifically between October 2010 and February 2011. R. at 169-70. If this work constituted substantial gainful activity, then Downes could not have been disabled between February 10, 2010 and November 14, 2011. However, the ALJ did not have sufficient information to conclude, as he did, that Downes was not engaged in substantial gainful activity since February 10, 2010. *See Id.* at 19. First, "[d]emonstration of substantial gainful activity derives from an evaluation of an individual's earnings," *Rivera*, 379 F. Supp. 2d at 605 (citing 20 C.F.R. §§ 404.1574, 416.974), and the record is inconclusive as to Downes' earnings as a property inspector, noting only that he earned four dollars per work order. R. at 170. Second, it cannot be determined from the present record whether this job was an "unsuccessful work attempt" as defined by the applicable regulations because the record does not indicate the reason why Downes stopped working. *See* 20 C.F.R. §§ 416.974(a); 416.974(c). If this period of employment was an unsuccessful work attempt, then Downes' earnings would not be relevant. 20 C.F.R. § 416.974(a)(1).

At the hearing, the ALJ did not question Downes regarding his job as a property inspector. Nor did he seek to obtain any information from Downes' employer or, if such information was unavailable, confirmation of the reason Downes discontinued work from one of his physicians or other medical source, which the ALJ was required to do under the SSA's rules. *See* SSR 05-02, at *3. Consequently, the Court cannot determine whether the ALJ's conclusion that Downes was not engaged in substantial gainful activity (even though it accrued to Downes' benefit) was supported by substantial evidence. Accordingly, as a threshold matter, the Court must remand the case to resolve this ambiguity in Downes' work history. *See, e.g.*, *Corporan*, 2015 WL 321832, at *30-31.

### b. The ALJ Did Not Satisfy His Duty to Develop the Record by Failing to Request Medical Source Statements from Downes' Treating Physicians

A more significant basis for remand is that the ALJ did not satisfy his duty to develop the record by failing to request medical source statements from Downes' treating physicians. Because "[t]he expert opinions of a treating physician as to the existence of a disability are binding on the factfinder, it is not sufficient for the ALJ simply to secure raw data from the treating physician." *Jackson*, 2014 WL 4695080, at \*19 (quoting *Peed*, 778 F. Supp. at 1246). The relevant regulations state that, "[w]hen the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled, . . . [w]e will first recontact your treating physician . . . or other medical source to determine whether the additional information we need is readily available." 20 C.F.R. § 404.1512(e). Therefore, the ALJ should have attempted to obtain such opinions from Drs. Weingarten and Piparo as to the limiting effects of Downes' pneumothorax symptoms during the period between February 10, 2010 and November 14, 2011, and there is nothing in the record to indicate that he did so.

Drs. Weingarten and Piparo were in a unique position to assess the severity and limiting effects of Downes' pneumothorax symptoms. The record indicates that Downes had been seeing Dr. Weingarten regularly since March 16, 2009. R. at 197. During these checkups, Dr. Weingarten examined Downes' lung and heart conditions and assessed his hypertension. *Id.* On February 10, 2010, the alleged disability onset date, it was Dr. Weingarten who observed significant changes in Downes' electrocardiogram and recommended an emergency room evaluation for blood work and a chest x-ray. *Id.* Subsequent to the evaluation, Downes was hospitalized at Robert Wood Johnson Hospital and underwent VATS pleurodesis for a spontaneous left-sided pneumothorax. *Id.* at 154, 196. Dr. Piparo then treated Downes after his

24

surgery at Robert Wood Johnson Hospital. *Id*. at 195-96. Dr. Piparo examined Downes three times between February and September 2010. *Id*. During these checkups, Dr. Piparo examined Downes' lung and heart conditions, and referred him to specialists for further testing and evaluation. *Id*. at 196. In contrast, the consultative assessments by Drs. Thukral and Meadow of Downes' medical conditions, on which the ALJ relied, were based on a single examination conducted more than a year after the alleged onset of Downes' disability. *Id*. at 190-93.

The opinions of Downes' treating physicians were important given other gaps in the medical record. For one, the SSA was unable to secure any records from Robert Wood Johnson Hospital where Downes was treated for his first pneumothorax in February 2010. *Id*. at 261-66. Second and perhaps more significantly, as noted by Dr. Bernanke at the hearing, the record lacked sufficient information to adequately assess Downes' ambulatory capability. *Id*. at 36-38. Dr. Bernanke testified that Downes' pneumothorax resulted in significantly diminished exercise capacity, *id*. at 37, and shortness of breath with minimal exertion, which was "a limiting factor in his capability to function." *Id*. at 38. However, he noted that his assessment was based on the tests taken at Montefiore and that he had difficulty understanding the tests' conclusion. *Id*. As a result, he stated that he was unable to determine Downes' ability to ambulate. *Id*. Based on the applicable SSA rules, ability to ambulate is a necessary metric in assessing a claimant's capacity to perform sedentary work. *See* SSR 96-8p, 1996 WL 374184, at *1, 5 (S.S.A. July 2, 1996) (In reaching determination of claimant's residual functional capacity, ALJ "must first . . . assess his or her work-related abilities on a function-by-function basis" and "[e]ach function must be considered separately (e.g., the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours)[.]") (internal quotation marks omitted). Therefore, the ALJ could not have found, as he did, that Downes had the residual functional capacity to perform the full range of sedentary work

prior to November 15, 2011. R. at 20.

In general, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record . . . .'" *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal*, 134 F.3d at 505 (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate); *Cruz v. Colvin*, No. 13-CV-1267 (WHP) (FM), 2014 WL 4384129, at \*13 (S.D.N.Y. Aug. 29, 2014) ("When the record evidence is inadequate to determine whether an individual is disabled, the ALJ must contact the claimant's medical sources to gather additional information.") (citations omitted) *adopted*, 2014 WL 5089580 (S.D.N.Y. Sept. 25, 2014).

Although the Second Circuit has held that "it is not *per se* error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician," a decision not to remand assumes that there are no obvious gaps in the record precluding the ALJ from properly assessing the claimant's residual functional capacity. *Sanchez v. Colvin*, No. 13-CV-6303 (PAE), 2015 WL 736102, at \*5 (S.D.N.Y. Feb. 20, 2015) (discussing how *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) reconciled seemingly competing directives in the SSA's regulations as to the need for seeking a treating physician's opinion); *see also Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order).[8]

As the court explained in *Sanchez*, 2015 WL 736102, at \*5, *Tankisi* held that the issue as

---

[8]     Despite the plain language of 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6), which seemingly impose a duty on the ALJ to solicit such medical opinions, the Second Circuit, albeit in unpublished decisions, has affirmed that it "does not always treat the absence of a medical source statement from claimant's treating physicians as fatal to the ALJ's determination" if there are otherwise "'no obvious gaps' that necessitate remand." *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (citing *Tankisi*, 521 F. App'x at 33-34 and *Rosa*, 168 F.3d at 79 n.5 ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.")).

26

to whether a treating physician's opinion is necessary "focuses on circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record." In *Tankisi*, the Court held that, despite the ALJ's failure to secure medical source statements from all of the claimant's treating physicians, remand was unnecessary under the circumstances because the record contained sufficient evidence from which the ALJ could assess the petitioner's residual functional capacity. 521 F. App'x at 34. Moreover, the record already contained an assessment of Tankisi's limitations from at least one of her treating physicians. *Id.* In contrast, the treatment notes and test results from Downes' treating physicians do not assess how Downes' symptoms limited his functional capacities. R. at 194-97, 198-203. The only direct assessments of Downes' functional capacities were made by the consultative physicians. *Id.* at 190-93, 204-07.

While an ALJ generally has "the authority to weigh various medical opinions and choose between them," *Scott*, 2010 WL 2736879, at \*16 (internal quotation marks omitted), the ALJ should have solicited Drs. Weingarten and Piparo's medical opinions prior to relying solely on the opinions of consultative physicians. *See* 20 C.F.R. § 404.1512 ("We will not evaluate this evidence [from a consultative examination] until we have made every reasonable effort to obtain evidence from your medical sources."). Thus, because the ALJ failed to seek out medical opinions from Downes' treating physicians and because other gaps in the record exist as to the functional limitations resulting from Downes' pneumothorax, which was the primary basis for his claimed disability during the period between February 10, 2010 and November 14, 2011, a remand to the Commissioner for further proceedings is warranted. *Umansky*, 7 F. App'x at 127.

## 2. Additional Evidence Submitted by Downes

By letter dated May 28, 2015, Downes asked the Court to consider additional evidence in deciding the Commissioner's motion, including a "doctors' letter," medical records from his

hospitalization in February 2010 (which he said that he had requested), recent x-rays of his

lungs, and the opinion of the "Occupational Therapist" at the hearing before ALJ Weiss on

December 19, 2012 that Downes was disabled since his first collapsed lung in February 2010.

(Dkt. No. 21). Downes also enclosed a compact disc containing images of his recent x-rays. *Id.*

        As a matter of law, however, evidence from outside the administrative record may not be

considered on judicial review of the Commissioner's findings. 42 U.S.C. § 405(g) ("The court

shall have the power to enter, upon the pleadings and transcript of the record, a judgment

affirming, modifying, or reversing the decision of the Commissioner of Social Security[.]")

(emphasis added); *see, e.g.*, *Tejada v. Colvin*, No. 14-CV-841 (JLC), 2014 WL 4744435, at *7

(S.D.N.Y. Sept. 24, 2014).

        Courts may instruct the Commissioner, however, to consider such evidence on remand,

where it is: new and not repetitive of what is in the existing record; material in the sense of being

both probative and relevant to the time period during which benefits were denied; and where

there is good cause for the failure to include it in an earlier proceeding. *Jones*, 949 F.2d at 60

(citing *Tirado v. Bowen*, 848 F.2d 595, 597 (2d Cir. 1988)). In addition, materiality requires that

there be a reasonable possibility that the "new evidence would have influenced the

[Commissioner] to decide [the] application differently." *Id.*

        None of the evidence Downes seeks to introduce provides independent grounds for

remand; however, because the Court is remanding the case for further proceedings on other

grounds, Downes may submit these materials on remand to the ALJ, to the extent they are not

duplicative of other evidence in the record and are material to the time period during which his

benefits were denied.

### III.   CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is

denied, and the case is remanded for further proceedings pursuant to sentence four of 42 U.S.C. §

405(g).[9] Specifically, on remand, the Commissioner should resolve the ambiguity with respect

to Downes' employment history, and request reports setting forth the opinions of Downes'

treating physicians, Drs. Weingarten and Piparo, as to the limitations of Downes' pneumothorax

condition on his functional capacities during the period between February 10, 2010 and

November 14, 2011.

**SO ORDERED.**

Dated: New York, New York
        July 22, 2015

JAMES L. COTT
United States Magistrate Judge

**A Copy of this Opinion and Order has been mailed to the following:**

Ronald A. Downes
637 East 224th Street
Apt. 2-F
Bronx, NY 10466-4069

---

9       "Although a remand request is normally made by a party, there is no reason why a court
may not order the remand sua sponte." *Armstrong v. Colvin*, No. 12-CV-8126 (VB) (PED),
2013 WL 6246491, at *2 n.1 (S.D.N.Y. Dec. 3, 2013) (quoting *Clark v. Callahan*, No. 96-CV-
3020 (SAS), 1998 WL 512956, at *1 (S.D.N.Y. Aug. 17, 1998)).